The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Sergio VALENCIA, a/k/a Cesar Holguin, Defendant–Appellant.

No. 05CA0572.

Colorado Court of Appeals, Div. VI.

April 5, 2007.

Certiorari Denied Oct. 1, 2007.

John W. Suthers, Attorney General, Susan E. Friedman, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Ned R. Jaeckle, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge DAILEY.

Defendant, Sergio Valencia, also known as Cesar Holguin, appeals the judgments of conviction entered upon jury verdicts finding him guilty of possession of marihuana with intent to distribute and possession of eight ounces or more of marihuana. He also appeals his adjudication and sentencing as an habitual criminal. We affirm.

Defendant's convictions arose from a traffic stop in rural Colorado. A state trooper pulled over a car, in which defendant was a passenger, for failure to use headlights when visibility was less than 1000 feet. The driver told the trooper that the car belonged to defendant. The trooper verified this by examining the car's registration and defendant's driver's license, both of which bore the name "Cesar Holguin." While the trooper was verifying the registration and proof of insurance, another trooper arrived to provide assistance.

The first trooper informed the second that he suspected the driver was under the influence of an intoxicant. The two troopers then approached on opposite sides of defendant's car, one to talk with the driver, the other to talk with defendant.

The first trooper asked the driver to step out of the car and accompany him to its rear. After returning the registration and proof of insurance to the driver, the trooper questioned him about where he had come from, where he was headed, and whether the car contained any weapons, drugs, or large sums of money.

Meanwhile, the second trooper approached defendant and told him to "keep [his] hands on the lap or someplace on the dash so [the trooper could] see where they're at." The trooper then asked defendant where he and the driver had been and where they were going. After receiving defendant's answers, the trooper stood for a few minutes toward the front of the car, observing the other trooper and the driver.

The first trooper took the driver into custody and then met with the second trooper to compare defendant's statements with the driver's. When the answers were found to be inconsistent, the troopers re-approached

defendant and asked him whether there were (1) any weapons or large amounts of cash in the vehicle, to which defendant replied "no"; (2) large amounts of marihuana in the car, to which defendant responded initially with a "yes," then immediately with a "no"; and (3) any drugs in the car, to which defendant answered, "no, no."

At this point, the first trooper asked, and was granted by defendant, permission to search the vehicle. Inside a metal compartment, located between the back seat and the trunk, the troopers found fifty pounds of marihuana. In a separate bag, located in the trunk, they found a pound of marihuana along with clothing that would fit a smaller man like defendant.

Prior to trial, defendant unsuccessfully moved to suppress the marihuana, asserting that he had been illegally detained before he consented to a search of the car. At trial, the defense argued that the drugs in the car belonged to the driver, not to defendant.

The jury convicted defendant. Subsequently, the trial court adjudicated him an habitual criminal based on evidence that he had three prior felony convictions. The court sentenced him to concurrent prison terms of twenty-four years for possession of marihuana with intent to distribute and twelve years for possession of eight or more ounces of marihuana.

## I. Suppression of Evidence

Defendant contends that the trial court erred in not suppressing the marihuana found in the car. We disagree.

The trial court ruled that the marihuana had properly been seized following defendant's voluntary consent to search the car. The court rejected defendant's argument that his consent to search was the product of an unreasonable seizure. The court found that reasonable suspicion existed to support a seizure when defendant equivocally answered the trooper's question about the presence of marihuana. The trial court found that defendant earlier had not been seized but rather had engaged in a consensual encounter with the police.

On appeal, defendant contends that he was illegally subjected to an investigatory detention when (1) he was told by the second trooper to "keep [his] hands on the lap or someplace on the dash so [the trooper could] see where they're at"; or (2) he was questioned, first, about his and the driver's travels, and then, about the presence of marihuana in the car. We are not persuaded.

With regard to the first contention, we note that, in the trial court, defendant did not even mention the trooper's instruction, much less present any argument that it constituted a seizure or in any other way affected the determination of whether he had been seized. Consequently, we decline to address it on appeal. *See People v. Huynh,* 98 P.3d 907, 913 (Colo.App.2004) (declining to address issue not raised in suppression hearing); *People v. Rogers,* 68 P.3d 486, 490 (Colo.App. 2002)(same).

With respect to defendant's second contention, the United States and Colorado constitutional protections against unreasonable searches and seizures do not proscribe all contact between police and citizens. *People v. Heilman,* 52 P.3d 224, 227 (Colo.2002).

In Colorado, we recognize three categories of encounters between police and citizens: (1) arrests; (2) investigatory stops; and (3) consensual encounters. Because arrests and investigatory stops are seizures, they implicate the search and seizure protections of the Fourth Amendment of the United States Constitution and article II, § 7 of the Colorado Constitution. *People v. Morales,* 935 P.2d 936, 939 (Colo.1997). In contrast, a consensual encounter—a contact in which the voluntary cooperation of a citizen is elicited by police through noncoercive questioning—is not a seizure, and thus, does not implicate constitutional search and seizure protections. *See People v. Jackson,* 39 P.3d 1174, 1179 (Colo.2002); *People v. Cervantes-Arredondo,* 17 P.3d 141, 146 (Colo. 2001).

As the moving party, defendant had the burden of showing (1) the point at which he was "seized" and (2) that the seizure was unconstitutional. *Outlaw v. People,* 17 P.3d 150, 155 (Colo.2001).

"[A] passenger is not seized within the meaning of the Fourth Amendment merely because the vehicle in which [he or] she is riding is subjected to a traffic stop...." *People v. Fines,* 127 P.3d 79, 81 (Colo.2006); *see People v. Jackson, supra,* 39 P.3d at 1185 ("The stop of the passenger is merely an unavoidable result of the driver's acquiescence in the police officer's command."). Thus, an investigatory stop of the driver does not preclude police from subsequently engaging in a consensual interview with the passenger. *People v. Jackson, supra,* 39 P.3d at 1187.

Inherent social pressure to cooperate with police is not in itself a sufficient basis for concluding that a police-citizen encounter constituted a seizure. *See People v. Johnson,* 865 P.2d 836, 842 (Colo.1994). However, a consensual interview can escalate into an investigatory stop if, upon consideration of the totality of the circumstances, a reasonable person, innocent of any crime, would feel that he or she was not free to leave the officer's presence or disregard the officer's request for information. *See People v. Jackson, supra,* 39 P.3d at 1188; *see also People v. Heilman, supra,* 52 P.3d at 228; *People v. Paynter,* 955 P.2d 68, 72–73 (Colo. 1998).

In *Jackson,* the supreme court identified the following as factors to consider in determining whether a seizure has occurred between a police officer and an occupant of a vehicle:

(1) whether there is a display of authority or control over the defendant by activating the siren or any patrol car overhead lights; (2) the number of officers present; (3) whether the officer approaches in a non-threatening manner; (4) whether the officer displays a weapon; (5) whether the officer requests or demands information; (6) whether the officer's tone of voice is conversational or whether it indicates that compliance with the request for information might be compelled; (7) whether the officer physically touches the person of the citizen; (8) whether an officer's show of authority or exercise of control over an individual impedes that individual's ability

to terminate the encounter; (9) the duration of the encounter; and (10) whether the officer retains the citizen's identification or travel documents.

*People v. Jackson, supra,* 39 P.3d at 1184.

When reviewing a motion to suppress, we defer to the trial court's findings of fact if those findings are supported by competent evidence in the record. However, we review the trial court's legal conclusions de novo. *People v. Heilman, supra,* 52 P.3d at 227.

Here, the trial court found that, at least until the troopers obtained reasonable suspicion, they and defendant were engaged in a consensual encounter. The court also found that, at most, only fifteen minutes had elapsed between the stop and defendant's giving the consent to search the car. In addition, the suppression hearing evidence does not suggest that the troopers demanded, as opposed to merely requested, information from defendant or that they touched him.

Further, the trial court noted that, although defendant had not been informed by the troopers that he could go, he also had not been told by them to stay. The court found:

> There's no coercive conduct involved at that stage. There's no withholding of information. There's no display of weapons or authority. There's no confrontational behavior or nonconversational tone of voice used. All the relevant factors here indicate that this is just a voluntary police-citizen encounter in which the Fourth Amendment is not implicated.

Because the trial court's findings are supported by the record and its conclusions by applicable law, we perceive no reason to disturb them.

In so concluding, we reject defendant's reliance on the outcomes in *People v. Jackson, supra; People v. Heilman, supra;* and *People v. Haley,* 41 P.3d 666 (Colo.2001). Those cases are, in our view, factually inapposite. *See People v. Jackson, supra,* 39 P.3d at 1188–90 (police retention of passenger's identification and ordering him to stay in the car while checking for outstanding warrants effectuated a seizure); *People v. Heilman, supra,* 52 P.3d at 228 (affirming trial court's finding that officer was not seeking passenger's cooperation and passenger was not free to leave where officer (1) approached vehicle in his marked patrol car at a higher than normal rate of speed; (2) parked in a T-formation close to the vehicle; (3) ordered the occupants to hold up their hands; and (4) in an unfriendly tone and rapid-fire manner, questioned them about activity the officer had just observed inside the car); *People v. Haley, supra,* 41 P.3d at 672 (police may not prolong stop of driver to question driver once the reason for the stop has been accomplished).

For these reasons, we conclude that the trial court did not err in denying defendant's motion to suppress.

## II. Alias

Defendant contends that the trial court reversibly erred by allowing the prosecution to refer to him before the jury as both "Sergio Valencia" and "Cesar Holguin." We disagree.

After his car was stopped by the troopers, defendant, identifying himself as Holguin, produced documentation evidencing ownership of the car under that name. Consequently, he was charged under the name Holguin. Subsequently, however, the prosecution successfully moved, without objection from the defense, to amend the information based on the assertion that an amendment was necessary to reflect defendant's true identity, that is, Sergio Valencia.

Before trial, defendant asked the court to require the prosecution to use only one name in front of the jury. Counsel argued that Holguin was the appropriate name to use because (1) defendant had used that name exclusively in his encounter with the troopers, (2) no evidence, apart from that related to defendant's prior convictions, would be introduced connecting him to the name Valencia, and (3) there was no proof that Holguin was not a valid name for defendant to use.

The record reflects that defendant had previously been convicted and deported under the name Sergio Valencia (as well as, on another occasion, the name Carlos Frias–

Enriquez) and that Cesar Holguin was not his true name because his fingerprints did not match those of the real Cesar Holguin.

When the trial court ruled that defendant would be referred to before the jury as Valencia, defendant then argued, to no avail, that allowing the prosecution to introduce evidence of his use of the name Holguin would inject impermissible alias evidence into the case.

On appeal, defendant again asserts that, by allowing the prosecution to refer to him as both Valencia and Holguin, the court erroneously admitted evidence of an alias which, under *People v. DeHerrera*, 680 P.2d 848, 849–50 (Colo.1984), served to unfairly impugn him before the jury as a member of a "criminal class." We are not persuaded.

■ Initially, we reject defendant's assertion that the prosecution had no basis upon which to identify him as Sergio Valencia. Defendant was shown, before trial, not to be the true Cesar Holguin. In addition, the prosecution had reason to believe that defendant's real name was Sergio Valencia, and defendant did not challenge the prosecution's motion to change his name to Sergio Valencia in the information. Under these circumstances, we perceive no error in the trial court's decision to allow the prosecution to refer to him as Sergio Valencia.

We also perceive no error in allowing in evidence of defendant's use of the name Cesar Holguin.

■ "Courts should allow the use of aliases only when proof of an alias is relevant to an issue before the court." *People v. DeHerrera, supra*, 680 P.2d at 849.

Evidence is relevant if it tends to make the existence of any fact of consequence to the determination of the action more probable or less probable than it would be without the evidence. *See* CRE 401. Under CRE 403, relevant evidence is excludable only if the danger of unfair prejudice substantially outweighs the legitimate probative value of the evidence. *See Masters v. People*, 58 P.3d 979, 1001 (Colo.2002) ("unfair" prejudice connotes an "undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympa-

thy, hatred, contempt, retribution, or horror" (quoting *People v. Dist. Court*, 785 P.2d 141, 147 (Colo.1990)) ).

■ Although evidence of the use of aliases carries with it a danger of unfair prejudice because it tends to indicate to the public that the defendant is a member of a "criminal class," it is nonetheless admissible when it is relevant to an issue of identification or an attempt to avoid detection. *People v. DeHerrera, supra*, 680 P.2d at 850.

■ Here, the evidence was relevant to issues of identification, of ownership of the car, and, inferentially, of possession of the marihuana. It was, after all, through the use of documents identifying defendant as Holguin and the car as Holguin's that defendant was strongly linked to a knowing possession of large amounts of marihuana: fifty pounds of marihuana was found in a secret compartment built under the car owned by defendant, under the name Holguin; and one pound of marihuana was found in the trunk in a bag, along with personal items belonging to a person of similar height to defendant as noted on the driver's license presented to the troopers under the name Holguin.

■ Because evidence of defendant's use of the name Holguin was relevant to several issues in the case, and its legitimate probative value was not, in our view, substantially outweighed by the danger of unfair prejudice, we conclude that it was admissible, consistent with the proper exercise of discretion, by the trial court. *See People v. Saiz*, 32 P.3d 441, 446 (Colo.2001)(trial courts have broad discretion to determine the relevance and relative probative value and unfair prejudice potential of evidence); *People v. Ortiz*, 155 P.3d 532, 534 (Colo.App.2006)(a trial court's decision to admit evidence will only be overturned if the decision was arbitrary, unreasonable, or unfair).

### III. Multiple Marihuana Convictions

■ Defendant contends that one of his marihuana convictions must be vacated. We disagree.

In *People v. Abiodun,* 111 P.3d 462, 470 (Colo.2005), the supreme court held that, under § 18–18–405(1)(a), C.R.S.2006, of the controlled substances act, a defendant could be separately convicted and sentenced for possession and possession with the intent to distribute only if the offenses were "factually distinct" from one another. The determination of "whether different acts could constitute more than one offense and whether sufficient evidence has been produced to support a factual finding of those acts are matters of law." *People v. Abiodun, supra,* 111 P.3d at 471.

In *Abiodun,* the supreme court recognized:

[D]istributions of a different quantum of drugs to different recipients, or to the same recipient on different occasions, involve different units of prosecution contemplated by [the statute], and therefore constitute separate and distinct offenses. Factors like proximity in space and time, intervening events, and volitional departures remain significant in assessing when transactions or occasions are sufficiently distinct, and therefore, whether different quanta of drugs are actually involved.

*People v. Abiodun, supra,* 111 P.3d at 471.

Here, although both defendant's crimes were prosecuted under the statute specific to marihuana, § 18–18–406(4)(b)(I), (8)(b)(I), C.R.S.2006, we use the *Abiodun* analysis to determine whether multiple convictions are sustainable. And we conclude that they are.

The one pound of marihuana that was the subject of the possession of eight or more ounces charge was found in the trunk in a piece of luggage in a Ziploc plastic bag, among other personal items. The packaging and location suggest that it was meant for personal use only.

In contrast, the fifty pounds of marihuana that was the subject of the possession with intent to distribute charge was found, wrapped in PVC, black plastic, and cellophane, in a secret compartment located behind the back seat of the passenger area. The packaging and amount of this marihuana suggest that it was meant for distribution to others.

Although the two sources of marihuana were discovered in close proximity and within a short time, they were different parcels of drugs that the jury could infer were to be used for different purposes. In our view, the offenses are sufficiently distinct to warrant separate convictions and sentences. *Cf. People v. Graham,* 53 P.3d 658, 664 (Colo.App.2001)(conviction for possession must be vacated where it was based on the same evidence as conviction for possession with intent to distribute).

### IV. Habitual Criminal Adjudication

Finally, defendant contends that his habitual criminal adjudication must be vacated because, after the habitual criminal proceedings commenced, the trial court continued the hearing to allow the prosecution to correct a foundational defect in documents evidencing his prior convictions. According to defendant, the trial court's action violated (1) the statutory mandate of § 18–1.3–803(1), C.R.S.2006, to conduct the habitual criminal hearing "[a]s soon as practicable" after trial and (2) double jeopardy protections. We only briefly address the first argument and reject the second.

### A. Facts

Following its opening statement in the habitual criminal hearing, the prosecution attempted to introduce three purportedly self-authenticated exhibits documenting defendant's alleged three prior felony convictions. The trial court admitted one of the three exhibits but denied admission of the other two after finding that they were not sufficiently authenticated under CRE 902.

Acknowledging that it could not prove defendant's habitual criminality without the two exhibits, the prosecution requested a continuance to correct the deficiencies in the authentication. The prosecution noted that, even though the exhibits concerned out-of-state convictions, it probably would not take long to correct the foundational deficiencies, and thus, the statutory mandate to conduct hearings "as soon as practicable" would not be violated.

Defendant objected to the prosecution's request, arguing that (1) the parties had an-

nounced their readiness to proceed to "trial" on the habitual criminal counts; and (2) if the prosecution could not go forward, the habitual criminal counts should be dismissed because a continuance could not be granted to give the prosecution the opportunity for a "do-over."

The court took the matter under advisement and gave each party fifteen days to provide it with additional authority on the arguments raised that day.

In his written objection to the continuance request, defendant relied only on double jeopardy principles, arguing that "[o]nce jeopardy has attached, [the prosecution] may not be allowed to continue a trial in order to reconstruct evidence that it has been told is insufficient to sustain its burden of proof."

The trial court rejected defendant's double jeopardy arguments based on its conclusion that a habitual criminal proceeding involves only a "hearing," and not a "trial." And the court found that, under the circumstances—where the foundational defects were technical in nature and not obvious to a reasonably diligent prosecutor—the prosecution was entitled to a reasonable continuance of the hearing. In passing, the court noted that a reasonable continuance for the prosecutor to correct the foundational deficiency would not violate the statutory mandate to conduct hearings "as soon as practicable."

Thereafter, the parties set the resumption of the habitual criminal hearing for a date that was (1) two and a half months away and (2) four and a half months since the hearing had been continued.

When the hearing resumed, defendant reiterated his earlier objections. In addition, his counsel stated, without elaboration, "I do believe that continuing today is a violation of [defendant's] rights to a fair trial, to a speedy trial."

### B. Section 18–1.3–803

Initially, we decline to address at length defendant's assertion that, in continuing the hearing for four and a half months, the trial court violated the mandate of § 18–1.3–803(1) to conduct the habitual hearing "[a]s soon as practicable" after trial.

Here, despite the fact that the "as soon as practicable" issue was raised by both the prosecutor and the trial court, defendant never took exception to their analyses. Defendant objected, almost exclusively, on double jeopardy grounds. The only objection which was not grounded in double jeopardy was a perfunctory reference, made when the hearing resumed, to a lack of a "fair trial, speedy trial."

In our view, defendant's reference to "speedy trial" would not have alerted the trial court to the point he now raises on appeal, because "speedy trial" encompasses constitutional and statutory analyses wholly independent of § 18–1.3–803(1).

Consequently, we conclude that defendant failed to properly preserve an "as soon as practicable" issue for appeal. *See Vigil v. People*, 134 Colo. 126, 129, 300 P.2d 545, 547 (1956) (to preserve objection for appeal, objection "must be stated with sufficient particularity as to call the attention of the court to the specific point").

"It is axiomatic that issues not raised in or decided by a lower court will not be addressed for the first time on appeal." *See People v. Salazar*, 964 P.2d 502, 507 (Colo.1998). While Crim. P. 52(b) provides us with discretion to notice "[p]lain errors or defects" that "were not brought to the attention of the court," "[p]lain error assumes that the [trial] court should have intervened sua sponte because the error was so obvious." *People v. Petschow*, 119 P.3d 495, 505 (Colo. App.2004).

Here, any error was not obvious. To date there is no case interpreting, or providing an analytical model how to apply, the "[a]s soon as practicable" part of § 18–1.3–803(1). Further, the vast majority of the delay between the prosecution's request for continuance and the resumption of the hearing was attributable to (1) the parties' briefing on the request to continue (two weeks); (2) the court's consideration and rendering of a decision on that issue (three weeks); and (3) the parties' subsequent choice of the date to resume the hearing (two and a half months). Under these circumstances, we

perceive no obvious error on the trial court's part.

### C. Double Jeopardy

■ We reject defendant's assertion that the trial court violated double jeopardy principles when it granted a continuance so that the prosecution could remedy a deficiency in its evidence.

■ Federal constitutional double jeopardy protections do not apply to habitual criminal proceedings. *Monge v. California,* 524 U.S. 721, 727–28, 118 S.Ct. 2246, 2250, 141 L.Ed.2d 615 (1998). However, in Colorado, double jeopardy protections are extended to habitual criminal proceedings as a matter of state constitutional law. *People v. Quintana,* 634 P.2d 413, 419 (Colo.1981).

■ Defendant correctly points out that double jeopardy principles forbid "a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks v. United States,* 437 U.S. 1, 11, 98 S.Ct. 2141, 2147, 57 L.Ed.2d 1 (1978); *see also Downum v. United States,* 372 U.S. 734, 737–38, 83 S.Ct. 1033, 1035–36, 10 L.Ed.2d 100 (1963) (double jeopardy barred retrial where prosecution obtained a mistrial upon discovering that a key witness had not appeared for trial); *People v. Berreth,* 13 P.3d 1214, 1216 (Colo.2000)(double jeopardy protection "addresses the basic concern that a government should not be allowed 'repeated chances to obtain a conviction of an accused'" (quoting *People v. Schwartz,* 678 P.2d 1000, 1010 (Colo.1984)) ).

■ A defendant's double jeopardy rights are violated only if (1) jeopardy attached at a proceeding and (2) an event terminated that "first" jeopardy and exposed the defendant to a "second" or "double" jeopardy.

For purposes of this appeal, we assume that jeopardy attached when the court admitted the one exhibit into evidence. *Compare Markiewicz v. Black,* 138 Colo. 128, 132, 330 P.2d 539, 541 (1958) (in a nonjury trial, jeopardy attaches when the court begins to hear evidence), *and McCoy v. Dist. Court,* 156 Colo. 115, 119, 397 P.2d 733, 734 (1964) (in a nonjury trial, jeopardy attaches when the presentation of proof begins), *with Chatfield v. Colo. Court of Appeals,* 775 P.2d 1168, 1175 (Colo.1989) (in a nonjury trial, jeopardy attaches when the first witness is sworn in to testify); *cf.* § 18–1–301(1)(d), C.R.S.2006 (barring reprosecution of matter improperly terminated "after the first prosecution witness is sworn if trial is by court following waiver of jury trial").

■ "The simple, yet ... controlling, consideration is that the accused must be placed in jeopardy twice for double jeopardy to exist. It happens when the second event involves a completely new beginning, i.e., when the second proceeding takes place before a new trier of fact, whether that be a different judge or jury, or the same judge starting with a clean slate." *Webb v. Hutto,* 720 F.2d 375, 379 (4th Cir.1983).

Ordinarily, for there to be a "completely new beginning," there must have been an "end" or "termination" of the prior proceeding, by way of conviction, acquittal, or mistrial (without either manifest necessity or the defendant's consent). *See Paul v. People,* 105 P.3d 628, 633 (Colo.2005)(double jeopardy prohibits retrial following a mistrial declared without manifest necessity or defendant's consent); *People v. Leske,* 957 P.2d 1030, 1035 n. 5 (Colo.1998) (double jeopardy prohibits reprosecution following acquittal or conviction of accused).

Because a midtrial continuance or recess does not "end" a proceeding, most authorities recognize that it does not expose a defendant to "double" jeopardy. *See* 21 Am.Jur.2d *Criminal Law* § 381 ("A continuance in a criminal prosecution is not analogous to a mistrial and does not raise an issue of double jeopardy."); Stephen J. Schulhofer, *Jeopardy and Mistrials,* 125 U. Pa. L.Rev. 449, 498–99 (1977)("[O]nce the trial begins, further delay may be occasioned by continuances, which are almost never held to violate double jeopardy restrictions, even after postponements of one month or longer. Indeed, decisions often hold mistrial improper precisely because the judge did not deal with a trial problem by ordering a continuance."); *see also, Holcomb v. State,* 858 So.2d 1112, 1113–14 (Fla.Dist.Ct.App.2003) (seven-month con-

tinuance in nonjury trial did not violate double jeopardy); *Knight v. State,* 197 Ga.App. 250, 398 S.E.2d 202, 204 (1990); *State v. Jackson,* 485 So.2d 630, 635 (La.Ct.App. 1986).

This rule applies even when a continuance is granted to allow the prosecution to rectify a problem with its evidence. *See Webb v. Hutto, supra,* 720 F.2d at 379–81; *Daniels v. State,* 12 Ark.App. 251, 674 S.W.2d 949, 950–51 (1984); *Drake v. State,* 467 N.E.2d 686, 689–90 (Ind.1984); *State ex rel. Fallis v. Vestrem,* 527 P.2d 195, 197–98 (Okla.Ct.Crim. App.1974); *State v. Bradshaw,* 680 P.2d 1036, 1040 (Utah 1984).

Indeed, we have found but one case in which an appellate court concluded that a midtrial continuance, granted to allow the prosecution to improve the posture of the case, exposed a defendant to double jeopardy. Even in that case, however, the court recognized that "a continuance in the course of a trial caused by prosecutorial neglect should not bar resumption unless the neglect is inexcusable and the continuance is an unreasonable break in the continuity of the trial." *State v. O'Keefe,* 135 N.J.Super. 430, 343 A.2d 509, 515 (Union County Court 1975).

Here, because the trial court did not start over but began from the point at which it had suspended the earlier hearing, we cannot say that defendant's "first" jeopardy had "ended" or "terminated." *See Webb v. Hutto, supra,* 720 F.2d at 380. Nor can we say, even following the *O'Keefe* analysis, that what happened here was "inexcusable" neglect on the part of the prosecution. The trial court found that the foundational defect it identified was of a technical nature that would not have been obvious to a reasonable prosecutor.

Under the authorities cited above, we conclude that the continuance did not effect a termination of the proceeding and thus expose defendant to double jeopardy upon the resumption of the proceeding.

Moreover, the extent of the delay caused by the continuance did not independently implicate the Double Jeopardy Clause. *See* Schulhofer, *supra,* 125 U. Pa. L.Rev. at 499 ("[D]ouble jeopardy doctrine is not, and probably never could be, useful for ensuring prompt disposition of the case. The constitutional right to a speedy trial provides the natural framework within which this problem can be addressed.").

Finally, we observe that, although the trial court exercised its discretion here to continue the habitual criminal hearing, it need not have done so. The court also had the discretion to deny the continuance and dismiss the habitual counts altogether.

The judgments of conviction and sentences are affirmed.

Judge GRAHAM and Judge RUSSEL concur.