Opinion by JUDGE GABRIEL
*556 ¶ 1 Defendant, Glenn McMinn, appeals the judgment of conviction entered on a jury verdict finding him guilty of, among other things, four counts of vehicular eluding, four counts of eluding a police officer, and one count of menacing. We conclude that (1) under double jeopardy principles, the four convictions for vehicular eluding are separate and do not merge, and the four convictions for eluding a police officer are separate and do not merge; (2) there was no plain error in the admission of a police sergeant's testimony regarding certain calculations that he made and his opinion that McMinn's truck was a deadly weapon; and (3) there was no plain error in the prosecutor's closing argument. Accordingly, we affirm.
I. Background
¶ 2 McMinn and his girlfriend got into a fight, and he called the police. When a police officer, Officer Anderson, arrived at his house, McMinn was already in his pickup truck. He backed out of his driveway and accelerated. Because there was packed snow and ice on the road, the truck slid sideways, striking the officer. McMinn then drove away.
¶ 3 Thereafter, a second officer, Officer Berry, spotted McMinn's truck and followed it. Officer Berry did not immediately pull McMinn over, however, because he wanted backup. A third officer, Officer Clements, then arrived, and Officer Berry signaled for McMinn to stop. McMinn did not do so but rather accelerated, with the two officers, in separate cars, now in pursuit. During this chase, McMinn drove into a residential neighborhood, ending in a cul-de-sac. The two officers positioned their cars to prevent him from exiting the cul-de-sac, but McMinn managed to drive out, and the officers again pursued him.
¶ 4 Thereafter, Officer Clements lost sight of McMinn, and Officer Berry took the lead in the pursuit. McMinn entered another neighborhood, turned into a dead-end street, and stopped. Officer Berry again tried to block the street with his car, and he exited his vehicle and walked toward the truck. McMinn, however, who was still in the truck, accelerated in Officer Berry's general direction. Officer Berry yelled at McMinn to stop, but McMinn continued coming toward the officer at what the officer estimated to be approximately twenty miles per hour. The officer then fired two shots into McMinn's vehicle, but McMinn drove away.
¶ 5 Shortly thereafter, a fourth officer, Deputy Glassburner, saw McMinn's vehicle and became the primary officer in pursuit. Deputy Glassburner activated his siren, but McMinn did not stop. Deputy Glassburner then tried an offensive maneuver called a precision immobilization technique (PIT), which was designed to end the pursuit by hitting the nose of the deputy's vehicle into the back fender of McMinn's truck, which would cause the truck to rotate. The PIT was unsuccessful, however, because McMinn was able to "power out" of the maneuver by accelerating.
¶ 6 Officer Anderson then became the primary officer in pursuit. During this portion of the chase, McMinn spun into the oncoming lane of traffic and drove in that lane for approximately four or five blocks. Shortly after returning to the correct lane, he slid off the right-hand side of the road onto the shoulder. Officer Anderson pushed his vehicle into McMinn's truck to force it further downhill, and although McMinn tried to pull away, his truck got caught in the snow, and he was arrested.
¶ 7 The entire chase lasted approximately eighteen minutes.
¶ 8 Based on these events, the prosecution initially charged McMinn, as pertinent here, with four counts of vehicular eluding, one for each of the pursuing officers, and with menacing of Officer Berry, based on the incident in the dead-end street.
¶ 9 At trial, the jury heard testimony from the four officers who had pursued McMinn and from Sergeant Pinson, who, among other things, had investigated the incident in the dead-end street. Although Sergeant Pinson was purportedly testifying as a lay witness, he described his training in accident reconstruction at some length. He then proceeded to testify to various calculations that he made concerning the incident in the dead-end *557 street, including calculations as to the acceleration rate of McMinn's truck, its speed as it approached Officer Berry, and the fact that when accelerating past Officer Berry, it was exerting approximately 171,000 foot pounds of force and would likely kill a pedestrian if it hit him or her. Based on the foregoing, Sergeant Pinson testified that in his opinion, McMinn's truck, when driven at the speed McMinn was driving when he approached Officer Berry, was a deadly weapon.
¶ 10 Before closing arguments, McMinn moved for a judgment of acquittal on three of the four counts of vehicular eluding, arguing that the law could not support four separate charges of vehicular eluding when, in his view, there was only one continuing and uninterrupted course of conduct. The prosecution responded, in pertinent part:
What [defense counsel is] ignoring is each one of these eluding counts has separate facts, has a separate officer that was being eluded that happened at separate times and separate locations.
For example, when ... Deputy Glassburner took over the chase ... Officer Clements and Officer Berry were no longer part of the chase. That's a separate incident.
When ... Deputy Glassburner tried the PIT maneuver and basically spun out and had to recover, Officer Anderson took over as a lead and he saw things that he observed, as well.
¶ 11 The court agreed with this portion of the prosecution's argument, ruling that the charges did not merge because "each officer, Officer Berry, Officer Clements, Officer Anderson and Officer Glassburner, ... testified about being eluded during separate times at separate locations, and they all had separate facts to them."
¶ 12 McMinn then requested that the court instruct the jury on the lesser nonincluded offense of eluding a police officer. He specifically requested that the court add one count of eluding a police officer for each count of vehicular eluding. The court granted this motion.
¶ 13 The case proceeded to closing arguments, and the prosecutor argued, as pertinent here, that although McMinn's theory of defense instruction stated that he had attempted to elude the officers safely, the concept of such safe eluding is "an oxymoron," "a contradiction in terms." The prosecutor also argued that the lesser nonincluded offenses were proffered as part of a defense strategy to play into people's "natural tendency to want to compromise."
¶ 14 The jury convicted McMinn of the four counts of vehicular eluding, the four counts of eluding a police officer, and the menacing count, among other charges.
¶ 15 McMinn now appeals.
II. Double Jeopardy
¶ 16 McMinn contends that under double jeopardy principles, his four convictions for vehicular eluding must merge with one another and his four convictions for eluding a police officer must also merge with one another. We are not persuaded.
A. Standard of Review and Governing Law
¶ 17 By moving on double jeopardy grounds for a judgment of acquittal on three of the four vehicular eluding counts, McMinn preserved his present challenge to those convictions, notwithstanding the People's argument that the motion had to be made before trial. See People v. Gordon, 160 P.3d 284, 286 (Colo.App.2007) (concluding that the defendant's post-trial motion to dismiss on double jeopardy grounds preserved the issue for appeal). As to the lesser nonincluded offenses of eluding a police officer, we view the preservation issue as close, but we will assume without deciding that McMinn's motion as to the vehicular eluding counts was sufficient to preserve the identical issue as to the eluding a police officer counts.
¶ 18 We review de novo a claim that a conviction violates a defendant's constitutional protection against double jeopardy. People v. Arzabala, 2012 COA 99, ¶ 19, 317 P.3d 1196, 1203, 2012 WL 2353784.
¶ 19 Multiplicity is the charging of the same offense in several counts, culminating in multiple punishments. People v. Vigil, 251 P.3d 442, 448 (Colo.App.2010). Multiplicitous *558 convictions are prohibited because they violate the constitutional prohibition against double jeopardy. Id.
¶ 20 To determine whether a defendant's conduct may support multiple convictions, we first identify the legislatively defined unit of prosecution. Id. "The unit of prosecution is the manner in which a criminal statute permits a defendant's conduct to be divided into discrete acts for purposes of prosecuting multiple offenses." Woellhaf v. People, 105 P.3d 209, 215 (Colo.2005).
¶ 21 To determine the unit of prosecution, we look exclusively to the statute and, where possible, seek to discern the legislative intent from the plain and ordinary meaning of the statutory language. Id. If, however, the statutory language is ambiguous, then we look to principles of statutory construction to ascertain legislative intent. Id.
¶ 22 Once we have identified the unit of prosecution, we then examine the evidence to determine whether the defendant's conduct constituted factually distinct offenses. Vigil, 251 P.3d at 448. To determine whether offenses are factually distinct, courts have considered (1) whether the acts occurred at different times and were separated by intervening events; (2) whether there were separate volitional acts or new volitional departures in the defendant's course of conduct; and (3) factors such as temporal proximity, the location of the victim (e.g., if the victim was moved), the defendant's intent as indicated by his or her conduct and utterances, and the number of victims. Quintano v. People, 105 P.3d 585, 591 (Colo. 005). Our supreme court has also considered whether the prosecution treated the acts as legally separable. Id. at 592. These factors, however, are not exclusive. Id. Rather, we look to all of the evidence introduced at trial to determine whether the evidence was sufficient to support distinct and separate offenses. Id.
¶ 23 If after performing this analysis, we conclude that the convictions are not based on separate offenses, then the convictions merge with one another. Vigil, 251 P.3d at 448.
B. The Unit of Prosecution for Vehicular Eluding
¶ 24 The offense of vehicular eluding is defined as follows:
Any person who, while operating a motor vehicle, knowingly eludes or attempts to elude a peace officer also operating a motor vehicle, and who knows or reasonably should know that he or she is being pursued by said peace officer, and who operates his or her vehicle in a reckless manner, commits vehicular eluding.
§ 18-9-116.5(1), C.R.S. 2012.
¶ 25 Accordingly, to commit vehicular eluding, a person operating a motor vehicle must, among other things, knowingly elude or attempt to elude a peace officer also operating a motor vehicle. In our view, this statutory language plainly contemplates a particular volitional act against a particular officer. This does not suggest, however, that the number of officers involved necessarily determines the number of different offenses, as the People contend. Such a reading would improperly read the phrase "a peace officer" in isolation from the other terms of the statute, which we cannot do. See Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist ., 109 P.3d 585, 597 (Colo.2005) ("[W]hen examining a statute's plain language, we give effect to every word and render none superfluous....").
¶ 26 "The clear intent behind the vehicular eluding statute is to protect members of the public from the dangers created by a driver attempting to elude a police officer." People v. Fury, 872 P.2d 1280, 1283 (Colo.App.1993). Thus, the unit of prosecution for vehicular eluding must be defined not in terms of the number of officers involved, but in terms of discrete volitional acts of eluding that have endangered the public. Indeed, as various other jurisdictions have observed in construing similar statutes, any other interpretation could lead to absurd results. See, e.g., Wallace v. State, 724 So.2d 1176, 1180-81 (Fla.1998) (noting that allowing as many charges as there were officers involved in a single incident could produce absurd results, as, for example, in the case of a motorist who continues driving despite an order to pull *559 over, resulting in a chase involving one hundred squad cars); accord Purnell v. State, 375 Md. 678, 827 A.2d 68, 83 (2003) ; cf. State v. Good, 851 S.W.2d 1, 6 (Mo.Ct.App.1992) (noting that the gist of the offense of resisting arrest is not dependent on how many officers were attempting to arrest the defendant and thus concluding that the defendant's conduct in resisting two officers trying to arrest her resulted in just one offense).
¶ 27 Accordingly, we conclude that a defendant may be charged with multiple offenses of vehicular eluding arising from a single criminal episode when he or she has performed discrete acts of eluding one or more peace officers, each constituting a new volitional departure in the defendant's course of conduct. See Quintano, 105 P.3d at 592 (concluding that five acts of sexual assault were factually distinct and thus supported separate offenses because, among other things, each act was separate in time and constituted a new volitional departure in the defendant's course of conduct).
¶ 28 We are not persuaded otherwise by McMinn's assertion that the phrase "eludes or attempts to elude" shows that vehicular eluding is a continuing offense that encompasses the entire course of conduct beginning with the defendant's initial intent to elude and ending when the pursuit ends. Cf. People v. Thoro Prods. Co., 70 P.3d 1188, 1193 (Colo.2003) (discussing the doctrine of continuing offenses in the context of statutes of limitations). This argument would have us read the phrase "eludes or attempts to elude" in isolation from the requirement that one must elude "a peace officer ... operating a motor vehicle," which, as noted above, we cannot do. See Colo. Water Conservation Bd., 109 P.3d at 597.
¶ 29 Moreover, "[t]he doctrine of continuing crimes can apply only where the General Assembly has unmistakably communicated its intent to create such an offense." Roberts v. People, 203 P.3d 513, 517 (Colo.2009). We perceive no such unmistakable intent in the statute at issue, and McMinn cites no applicable authority or legislative history to suggest such an intent. Cf. id. (noting that the language of the consolidated theft statute did not suggest an intent to create a separate and distinct crime of theft by deception that continues until the deception ends). But cf. People v. Herron, 251 P.3d 1190, 1193-94 (Colo.App.2010) (concluding that the unit of prosecution for stalking is a continuous course of conduct, where the statute proscribed certain acts performed "repeatedly").
C. The Unit of Prosecution for Eluding a Police Officer
¶ 30 The offense of eluding a police officer is defined as follows:
Any operator of a motor vehicle who the officer has reasonable grounds to believe has violated a state law or municipal ordinance, who has received a visual or audible signal such as a red light or a siren from a police officer driving a marked vehicle showing the same to be an official police, sheriff, or Colorado state patrol car directing the operator to bring the operator's vehicle to a stop, and who willfully increases his or her speed or extinguishes his or her lights in an attempt to elude such police officer, or willfully attempts in any other manner to elude the police officer, or does elude such police officer commits a class 2 misdemeanor traffic offense.
§ 42-4-1413, C.R.S.2012.
¶ 31 Thus, to establish the crime of eluding a police officer, the prosecution must prove, among other things, that a motor vehicle operator received a signal from a police officer to stop but increased his or her speed, extinguished his or her lights, or took other action to elude the police officer. In our view, this statutory language, like that of the vehicular eluding statute discussed above, plainly contemplates a particular volitional act against a particular officer. Accordingly, for the same reasons as discussed above, we conclude that a defendant may be charged with multiple offenses of eluding a police officer arising from a single criminal episode when he or she has performed discrete acts of eluding, each constituting a new volitional departure in the defendant's course of conduct. See Quintano, 105 P.3d at 592.
¶ 32 In reaching this conclusion, we reject the parties' alternative interpretations, which *560 essentially mirror their interpretations of the vehicular eluding statute, for the reasons discussed above.
D. Evidence Supporting Separate Offenses
¶ 33 Having thus defined the applicable units of prosecution for vehicular eluding and for eluding a police officer, the question becomes whether McMinn's conduct constituted factually separate offenses so as to support each of his convictions. We conclude that it did.
¶ 34 Here, the prosecution argued, and the trial court ruled, that the offenses at issue were separate because they involved four separate times, places, facts, and officers. See id. (noting that in determining whether offenses are factually distinct, we may consider whether the prosecution treated the acts as legally separable). The record amply supports the trial court's determination.
Specifically, evidence in the record showed the following:
? McMinn recklessly eluded Officer Berry, despite the officer's signal, by driving away from him at high speeds on icy roads with his headlights off, and by later accelerating past him when he tried to block McMinn into the dead-end street.
? McMinn recklessly eluded Officer Clements, despite the officer's signal, by driving away from him at high speeds on icy roads with his headlights off, and then driving past him and Officer Berry when they tried to block him in the cul-de-sac. (Although this offense involved, in part, both Officer Clements and Officer Berry, as noted immediately above, the evidence established a distinct offense involving just Officer Berry.)
? McMinn recklessly eluded Deputy Glassburner, despite the officer's signal, by driving away from him at high speeds on icy roads with his headlights off, and accelerating his vehicle to "power out" of the PIT maneuver.
? And McMinn recklessly eluded Officer Anderson, despite the officer's signal, by driving away from him at high speeds on icy roads with his headlights off, driving in the lane of oncoming traffic, sliding off the right hand side of the road onto the shoulder, and attempting to pull away as Officer Anderson tried to pin his car against McMinn's truck.
¶ 35 Accordingly, the record amply supports the trial court's determination that each officer's above-described pursuit took place at a different time and in a different location, was separated by an intervening event, and included a discrete and new volitional act by McMinn. Stated otherwise, this was not merely a single, continuous, and uninterrupted volitional act of eluding by McMinn with several officers simultaneously in pursuit. Rather, McMinn took different evasive actions at different times against different police officers, and this evidence rendered each officer's chase sufficiently distinct from the others so as to support separate convictions. See id. (holding that although a series of sexual assaults all occurred close in time, on a single day, and at the same house, the assaults were sufficiently distinct to support separate convictions because, among other things, the defendant had time to reflect after each encounter, he persisted after the victim told him to stop, and each incident occurred in a different location in the house); People v. Valencia, 169 P.3d 212, 220 (Colo.App.2007) (holding that two marijuana offenses were factually distinct because, although two packages of drugs were found in the same car and at approximately the same time, one was an eight-ounce Ziplock bag that appeared to be for personal use and the other was a fifty-pound package that appeared to be meant for distribution), abrogated in part on other grounds by Brendlin v. California, 551 U.S. 249, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007).
¶ 36 State v. Allen, 208 W.Va. 144, 539 S.E.2d 87, 91-92 (1999), supports our determination here. In Allen, the defendant fled from an officer by vacating his car, hiding in another car, and then running away while another officer attempted to place him in a patrol car. Id. at 91. The next day, officers learned that the defendant was at a friend's home. Id. When officers reached that home, *561 however, the defendant had already fled. Id. at 91-92. Despite a subsequent sighting and brief foot pursuit, the defendant again escaped. Id. at 92. Later that day, a third party spotted the defendant in the third party's garage. Id. Officers arrived and surrounded the premises, but the defendant commandeered the third party's truck and fled by crashing through the closed garage door. Id. After losing control of the truck and attempting to flee on foot, however, the defendant was finally arrested. Id .
¶ 37 On these facts, the court affirmed the defendant's multiple convictions, holding that the applicable statute did not prohibit multiple simultaneous convictions for nonvehicular flight when during one extended episode of flight, a defendant commits intervening acts of a criminal nature such that the various instances of flight are separate and distinct occurrences. Id. at 104.
¶ 38 Here, as in Allen, McMinn's conduct, although arguably part of a single chain of events leading to his arrest, involved different volitional acts directed at different officers at different times. Thus, we conclude that as in Allen, the evidence supports separate convictions here.
¶ 39 We are not persuaded otherwise by the out-of-state cases on which McMinn relies. In those cases, there was no suggestion that the crimes at issue were factually distinct. See, e.g., Foley v. Commonwealth, 233 S.W.3d 734, 737-38 (Ky.Ct.App.2007) (concluding that multiple convictions for fleeing and evading were not warranted merely because other officers became involved in a multi-county chase after the defendant ignored the first officer's order to stop); Purnell, 827 A.2d at 70, 79-80 (in a case in which the defendant simultaneously fled two police officers by running through a parking lot, the court concluded, "It is inconceivable, under the circumstances and the State does not argue, that the petitioner's conduct could be viewed as two separate events.... [T]he petitioner's conduct was obviously one single and continuous course of conduct."); Good, 851 S.W.2d at 2, 6 (concluding that the evidence was insufficient to support two separate convictions for resisting arrest, where the defendant simultaneously resisted arrest by two officers).
¶ 40 Accordingly, we conclude that the evidence in this case was sufficient to support four separate convictions of vehicular eluding and four separate convictions of eluding a police officer.
III. Sergeant Pinson's Purported "Lay" Testimony
¶ 41 McMinn contends that the trial court plainly erred in allowing Sergeant Pinson to testify, as a lay witness, to his above-described calculations and to opine, based on these calculations, that the truck was a deadly weapon. McMinn asserts that such testimony was expert opinion in the guise of lay testimony and that it improperly usurped the jury's function. Although we agree that such testimony was not lay testimony, we conclude that reversal is not warranted on this basis.
A. Standard of Review
¶ 42 Because McMinn did not preserve his present contentions in the trial court, we review for plain error. See People v. Herdman, 2012 COA 89, ¶ 16, 310 P.3d 170, 175, 2012 WL 2045733. Plain error review addresses error that is obvious and substantial and that so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. Id.
B. Lay or Expert Testimony
¶ 43 Under CRE 701, a non-expert witness may give testimony in the form of opinions or inferences as long as they are
(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [CRE] 702.
Accord People v. Warrick, 284 P.3d 139, 145 (Colo.App.2011).
¶ 44 Police officers regularly and appropriately offer testimony under CRE 701 based on their perceptions and experiences.
*562 People v. Stewart , 55 P.3d 107, 123 (Colo.2002) ; Warrick , 284 P.3d at 145. A police officer's testimony becomes objectionable, however, when what is essentially expert testimony is improperly admitted under the guise of lay opinions. Stewart, 55 P.3d at 123 ; Warrick, 284 P.3d at 145.
¶ 45 In determining whether testimony is lay or expert, courts should consider whether the opinion results from a process of reasoning familiar in everyday life, or a process of reasoning that can be mastered only by specialists in the field. Warrick, 284 P.3d at 145. Lay witness opinion testimony is proper only if the opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person. Id. In deciding whether an opinion is one that could be reached by any ordinary person, courts consider whether ordinary citizens can be expected to know certain information or to have had certain experiences. Id.
¶ 46 Here, Sergeant Pinson testified to the training that he had received in accident reconstruction, including the number of hours of training that he had received, the levels of training that he had completed, and the subjects that had been covered at each level. Then, using "time-distance analysis," he determined that the truck's acceleration rate was "10.99 feet per second squared," and he calculated the truck's speed and its exertion of "about 171,000 pounds of foot force."
¶ 47 In our view, this testimony did not result from a process of reasoning familiar in everyday life. Rather, it reflected a process of reasoning that required specialized knowledge and that could be mastered only by specialists in the field. Accordingly, we conclude that this testimony was not proper lay opinion but rather was expert testimony presented in the guise of lay opinion, and that the error in admitting such testimony was obvious and substantial. See Stewart, 55 P.3d at 124 (holding that it was inappropriate for the court to permit a police officer to testify as a layperson to, among other things, his deductions about such matters as a vehicle's direction, position, and speed). For two reasons, however, we conclude that the error here did not so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction.
¶ 48 First, Officer Berry testified, based on his first-hand observation, that the truck was traveling "in the neighborhood of 20 miles an hour as it was approaching," and the length of the truck's tire tracks and the very short time that it took the truck to reach the officer supported this estimate. Accordingly, Sergeant Pinson's testimony regarding the truck's speed was cumulative of other evidence properly presented at trial. People v. Joyce, 68 P.3d 521, 524 (Colo.App.2002) (concluding that the admission of certain hearsay statements was not plain error when such evidence was "merely cumulative").
¶ 49 Second, Sergeant Pinson's determination that the truck was a deadly weapon, which was supported by his various calculations, amounted to little more than a conclusion that a truck traveling at twenty-six miles per hour toward a person is capable of killing him or her, a fact that would be obvious to any layperson.
¶ 50 Accordingly, we conclude that the erroneous admission of Sergeant Pinson's expert opinions does not warrant reversal here. See Stewart, 55 P.3d at 124-25 (concluding that an officer's improper expert testimony was harmless because (1) his conclusion about the vehicle's acceleration was corroborated by the defendant's testimony, (2) his conclusions about the speed and angle of the vehicle were corroborated by eyewitness testimony, and (3) his conclusions tending to show that the vehicle was driven over the victim's head related to an undisputed fact).
C. Usurping the Jury's Function
¶ 51 Under CRE 704, a witness may offer testimony that embraces an ultimate issue of fact but may not usurp the function of the jury. See People v. Rector, 248 P.3d 1196, 1203 (Colo.2011).
We examine a number of factors when determining whether expert testimony usurped the function of the jury, including but not limited to, whether the testimony was clarified on cross-examination, and *563 whether the expert's testimony expressed an opinion of the applicable law or legal standards thereby usurping the function of the court. We also consider whether a jury was properly instructed on the law and that it may accept or reject the expert's opinion. An additional factor is whether an expert opined that the defendant committed the crime or that there was a particular likelihood that the defendant committed the crime.
Id. (citations omitted).
¶ 52 Here, McMinn contends that Sergeant Pinson's opinion that McMinn's truck was a deadly weapon improperly usurped the jury's role by essentially directing a verdict on (1) the issue of whether the truck was a deadly weapon, and (2) the issue of McMinn's culpable mental state. We are not persuaded.
¶ 53 We see nothing in the record supporting McMinn's suggestion that the jury believed it was bound to accept Sergeant Pinson's characterization that the truck was a deadly weapon. To the contrary, the jury was properly instructed (1) on the meaning of the term "deadly weapon," (2) that it was to follow the rules of law as explained by the court, and (3) that it could believe all, part, or none of any witness's testimony.
¶ 54 Likewise, notwithstanding McMinn's suggestion to the contrary, Sergeant Pinson said nothing about whether McMinn acted knowingly or with intent when he drove toward Officer Berry.
¶ 55 And the fact that Sergeant Pinson's testimony tracked the language of one of the elements of the crime at issue did not alone render his opinion such an obvious usurpation of the jury's role as to rise to the level of plain error. See People v. Destro, 215 P.3d 1147, 1152 (Colo.App.2008) (holding that the trial court did not abuse its discretion in allowing an expert to testify that a particular transaction was a "security," a term used in the crime's elements, because, among other things, the expert offered no opinion regarding the defendant's guilt and the jury was instructed that it was free to reject the expert's opinion and that it should follow the law as given by the court).
¶ 56 For these reasons, we perceive no plain error or usurpation of the jury's role in Sergeant Pinson's testimony here.
IV. Prosecutorial Misconduct
¶ 57 McMinn contends that reversal is required due to prosecutorial misconduct in closing argument. We are not persuaded.
A. Standard of Review and Applicable Law
¶ 58 When, as here, a defendant does not object at trial to a prosecutor's statements, we review appellate allegations of prosecutorial misconduct under the plain error standard. People v. Strock, 252 P.3d 1148, 1152 (Colo.App.2010). To constitute plain error, prosecutorial misconduct must be flagrant or glaringly or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. Id. Prosecutorial misconduct in closing argument rarely constitutes plain error. Id. at 1152-53.
¶ 59 In reviewing a claim of prosecutorial misconduct, we engage in a two-step analysis. People v. Samson, 2012 COA 167, ¶ 29, 302 P.3d 311, 316. First, we must determine whether the prosecutor's challenged conduct was improper based on the totality of the circumstances. Id. Second, we must consider whether such conduct warrants reversal according to the proper standard of review. Id. Each of these steps is analytically independent of the other. Id.
¶ 60 We must evaluate claims of improper argument in the context of the argument as a whole and in light of the evidence before the jury. Id. at ¶ 30, 302 P.3d at 316-17. In doing so, we recognize that prosecutors have wide latitude in the language and style they choose to employ, as well as in replying to an argument by opposing counsel. Id. In addition, because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful. Id.
*564 ¶ 61 Prosecutors may comment on the evidence admitted at trial and the reasonable inferences that can be drawn therefrom. Id. at ¶ 31, 302 P.3d at 317. They may also employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance. Id.
¶ 62 Although a prosecutor may argue all reasonable inferences from the evidence in the record, he or she may not misstate or misinterpret the law, People v. Cevallos-Acosta , 140 P.3d 116, 122 (Colo.App.2005), and may not refer to facts not in evidence, People v. Walters, 148 P.3d 331, 334 (Colo.App.2006). Nor may a prosecutor state or imply that defense counsel has presented the defendant's case in bad faith or otherwise make remarks for the purpose of denigrating defense counsel. People v. Collins, 250 P.3d 668, 678 (Colo.App.2010).
¶ 63 Finally, although trial courts are to refrain from distinguishing between the "court's instructions" and the "defendant's instructions," it is not misconduct for a prosecutor to refer to the fact that an instruction setting forth the defense theory is argument, not a statement of law, and that the jury need not follow it. See People v. Welsh, 176 P.3d 781, 788 (Colo.App.2007).
B. Statements on "Safe" Eluding
¶ 64 McMinn asserts that the prosecutor misstated the law by arguing as follows:
You probably remember the judge reading jury instruction No. 23 to you. This is the defense theory. This is what they are saying. They say it's the theory of the defense that the defendant was-was attempting to elude the police.
So he's given that up. He's confessing that. "Yes, I was eluding the police." Then, look at this second line. But he was-"attempted to do so 'safely'?" "And not in a reckless manner." Somebody please explain to me how you can elude police officers in a safe manner. That's an oxymoron. It's a contradiction in terms.
I can only think of one chase like that. That's when O.J. Simpson, years ago, a friend was driving down the freeway, but they were driving under the speed limit while O.J. was on the phone. No weaving. No reckless driving. No speeding. No passing by officers.
¶ 65 McMinn asserts that this argument misstated the law because it incorrectly suggested that McMinn's theory of defense was not cognizable. We are not persuaded.
¶ 66 Although the element of recklessness, among other things, distinguishes vehicular eluding from eluding a peace officer, compare § 18-9-116.5(1)with § 42-4-1413, the concept of "safe eluding" is not an element that distinguishes the crimes from one another, and the prosecutor was free to question that part of the defense theory. See People v. Vialpando, 804 P.2d 219, 225 (Colo.App.1990) ("A prosecutor is afforded considerable latitude in the right to reply to an argument by opposing counsel.").
¶ 67 Moreover, when viewed in context, the prosecutor's argument appears to have been a comment on the evidence, not a comment on the applicable law. Thus, the prosecutor conceded that there could be a scenario involving "safe eluding," citing the O.J. Simpson case, but the prosecutor went on to detail how, in this case, McMinn's eluding was not safe because he drove over one hundred miles per hour on icy roads and sixty miles per hour in residential neighborhoods, he had his headlights off, and he ran at least one red light.
C. Statements on Lesser Offenses
¶ 68 McMinn next asserts that the prosecutor argued facts not in evidence, denigrated the defense, and misstated the law by arguing as follows:
So what they're basically saying is, I know my client's guilty, but I want you to find him guilty of something less serious. And what they're trying to hang their hat on is to try to convince you that somehow this was a safe eluding at speeds over 100 miles an hour on icy roads, and that he's only guilty of that lesser offense. They're hoping to play into [p]eople's natural tendency to want to compromise. I mean, that's what groups tend to do.
If you've ever been in any meeting, eventually people just kind of get together and *565 they say, okay, why don't we just meet in the middle. And that's what they're hoping to do, is kind of take advantage of that kind of common psychology, and hoping you folks, rather than looking at the evidence like you took an oath to do, just simply say let's just compromise and find him guilty of the lesser offense.
¶ 69 We agree with McMinn that these comments, which were not supported by any evidence and which suggested inappropriate conduct by defense counsel, were improper. See Williams v. State, 593 So.2d 1189, 1190 (Fla.Dist.Ct.App.1992) (concluding that it was "patently improper" for a prosecutor to argue that the inclusion of lesser included offense instructions was an attempt to make the jury "feel sorry for [the defendant] and disobey the law and find [him] guilty of some lesser-charge"); State v. Nobles, 106 Ohio App.3d 246, 665 N.E.2d 1137, 1153 (1995) (concluding that it was "highly improper" for a prosecutor to suggest that defense counsel requested lesser included offense instructions to "mitigate [the defendant's] damages" and to argue that the instructions were like a game of picking "door number one, door number two, door number three"); Commonwealth v. Gilman, 470 Pa. 179, 368 A.2d 253, 258 (1977) (concluding that the prosecutor "continually exceeded the bounds of permissible argument" by contending that the defendant's strategy of admitting a lesser degree of guilt and seeking acquittal on the higher degree was an attempt to "becloud the issue," "deceive" the jury, and "sneak out" with a lesser verdict).
¶ 70 Nonetheless, although we do not condone the prosecutor's improper comments, we cannot say that these comments were flagrant or glaringly or tremendously improper, or that they were sufficient to undermine the fundamental fairness of the trial or cast serious doubt on the reliability of the judgment of conviction. These comments made up a small part of the prosecutor's closing argument, during which he generally and fairly summarized the evidence and provided reasons, based on the evidence, for convicting McMinn. See People v. Whitman, 205 P.3d 371, 385 (Colo.App.2007). Moreover, the evidence supporting McMinn's conviction was strong. See People v. Estes, 2012 COA 41, ¶¶ 39, 42, 296 P.3d 189, 196 (concluding that prosecutorial misconduct in closing argument did not warrant reversal because, among other things, overwhelming evidence supported the guilty verdict).
¶ 71 Accordingly, we perceive no plain error in the prosecutor's comments regarding the reasons for McMinn's tendering the requested lesser nonincluded defense instructions.
D. Identifying Defense Instructions and Verdict Forms
¶ 72 Finally, McMinn asserts that in addressing his theory of defense and lesser nonincluded offenses, the prosecutor improperly identified which instructions and verdict forms had been proffered by McMinn. We agree with the People, however, that the prosecutor did not do so. Rather, he merely identified the theory of defense instruction and argued against it, which he was free to do. See Welsh, 176 P.3d at 788.
V. Conclusion
¶ 73 For these reasons, the judgment is affirmed.
JUDGE DAILEY and JUDGE BERNARD concur.