23CA0517 Peo v Lorenz 04-30-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0517
El Paso County District Court No. 21CR3965
Honorable Chad Miller, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Keith Allen Lorenz,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE LIPINSKY
Welling and Tow, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 30, 2026

---

Philip J. Weiser, Attorney General, Alejandro Sorg Gonzalez, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Stephen Arvin, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Keith Allen Lorenz appeals his convictions for vehicular homicide, driving under the influence (DUI), and DUI per se.  We affirm in part and reverse in part.

I.    Background

¶ 2    A jury could have reasonably found the following facts from the evidence introduced at trial.

¶ 3    A truck drove off a highway and rolled over multiple times.  The two individuals in the truck were ejected, and one died at the scene.  Several people witnessed the crash, although they did not see who had been driving.  Witnesses observed evidence of alcohol at the scene.

¶ 4    At the crash site, state troopers found the survivor of the crash injured and "impaired."  The troopers also found several bottles of alcohol and two marijuana cigarettes near and inside the truck, and they detected "a strong odor of alcohol coming from within the [truck]."

¶ 5    The survivor was transported to a hospital, where Trooper Alvaro Acuna questioned him after identifying him as Lorenz.  Trooper Acuna asked Lorenz who had been driving the truck when it crashed.  Lorenz at first said that he and the victim "were both

1

driving." He gave varying answers to Trooper Acuna's further questions intended to determine who had been behind the wheel:

- He'd "be lying if that [was] something [he] could tell [Trooper Acuna]."

- He was "in the passenger seat most of the time."

- He would not tell Trooper Acuna who had been driving.

- He did not want "to incriminate [him]self."

¶ 6 Lorenz finally admitted that he had been driving at the time of the crash.

¶ 7 In addition, Trooper Acuna noticed "signs of impairment" when he spoke with Lorenz, including that Lorenz's eyes were "incredibly watery and bloodshot," his speech was "slurred and at many times inaudible," and his breath had "an odor of an unknown alcoholic beverage." In response to Trooper Acuna's questions about whether he had been drinking, Lorenz said that he had drunk "a [thirty-two] ounce beer" containing "25% [alcohol]" and that, over the past twenty-four hours, "he had about one case of alcohol."

¶ 8 Trooper Acuna also noticed that Lorenz's left shoulder had a rectangular bruise, which Trooper Acuna recognized as "consistent

2

with injuries sustained after wearing a seat belt [during] a crash." Lorenz said he had been wearing a seatbelt at the time.

¶ 9      After Lorenz admitted that he had been driving at the time of the crash, he became "emotional" and asked if the victim had died. Trooper Acuna told Lorenz the victim had died and advised him of his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

¶ 10      After Lorenz waived his *Miranda* rights, he became "increasingly emotional" and told Trooper Acuna he had "picked up [the victim] way beyond the legal limit," that he "was not right while he was driving," and that marijuana and cocaine would be found in his system. In addition, while at the hospital, Lorenz failed a horizontal gaze nystagmus test, a standardized field sobriety test.

¶ 11      After Lorenz said he had been driving, Trooper Acuna arrested him and obtained blood samples.

¶ 12      The blood samples tested positive for marijuana, but not cocaine, and showed that his blood alcohol content (BAC) was 0.188 grams per 100 milliliters.

¶ 13      In the meantime, Trooper Joshua Yoder visited the liquor store at which Lorenz and the victim had purchased alcoholic beverages

about an hour before the crash. Surveillance video from the store shows Lorenz and the victim leaving, and the victim entering the truck on the passenger side. The video shows Lorenz walking toward the driver's side door before the truck drives off.

¶ 14 Lorenz was charged with one count of vehicular homicide, one count of DUI, and one count of DUI per se.

¶ 15 The only contested issue at trial was whether Lorenz had been driving at the time of the crash.

¶ 16 The prosecution presented the following evidence to prove that Lorenz had been driving at the time:

- his statements at the hospital;

- the bruise on his left shoulder;

- Lorenz's injuries, which were primarily on the left side of his body, correlated with evidence that the truck rolled onto the driver's side;

- the injuries on the right side of the victim's body;

- the placement of the truck's seats, which were consistent with the height differential between Lorenz and the taller victim; and

- the liquor store surveillance video.

¶ 17    The jury convicted Lorenz as charged.  The trial court imposed a controlling sentence of ten years in the custody of the Department of Corrections.

¶ 18    On appeal, Lorenz first contends that his statements at the hospital were inadmissible because the totality of the circumstances shows that (1) a reasonable person in Lorenz's position would have understood he was in custody for *Miranda* purposes before Trooper Acuna gave Lorenz the *Miranda* advisement; (2) the officers coerced Lorenz into incriminating himself; (3) Lorenz's *Miranda* waiver was involuntary; (4) Lorenz's statements following his *Miranda* advisement were the product of an unlawful two-step interrogation; and (5) Lorenz clearly invoked his right to remain silent.  Second, Lorenz contends that, because his statement that he did not want to incriminate himself was inadmissible, the prosecutor committed misconduct by referring to it during closing argument.  Third, Lorenz contends that the trial court abused its discretion by excluding information regarding the victim's three prior DUI or driving while ability impaired (DWAI) convictions, which Lorenz asserts were admissible alternate suspect evidence.  And fourth,

5

Lorenz contends that his DUI and DUI per se convictions must merge with his vehicular homicide conviction.

## II. Analysis

### A. Lorenz's Statements at the Hospital

¶ 19    "To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* prohibits the prosecution from introducing in its case-in-chief any statement, whether inculpatory or exculpatory, procured by custodial interrogation, unless the police precede their interrogation with certain warnings." *Mumford v. People*, 2012 CO 2, ¶ 12, 270 P.3d 953, 956 (quoting *People v. Matheny*, 46 P.3d 453, 462 (Colo. 2002)).  "*Miranda* protections apply only where 'a suspect is subject to both custody and interrogation.'" *Id.* (quoting *Effland v. People*, 240 P.3d 868, 873 (Colo. 2010)).  There is no dispute that Lorenz was interrogated at the hospital.

### 1. Additional Facts

¶ 20    Defense counsel filed a pretrial motion to suppress Lorenz's statements at the hospital.  Defense counsel argued, as relevant here, that (1) Trooper Acuna did not timely advise Lorenz of his

*Miranda* rights; (2) Lorenz's statements at the hospital were involuntary; and (3) he did not voluntarily waive his *Miranda* rights.

¶ 21    The court heard argument on the motion at a suppression hearing. At the hearing, Trooper Acuna testified as follows.

¶ 22    He arrived at the hospital with Sergeant Dan Brusuelas. Both Sergeant Brusuelas and Trooper Acuna were wearing their Colorado State Patrol uniforms and had their handguns and tasers holstered. Once at the hospital, the officers waited about thirty to forty-five minutes to speak with Lorenz while medical professionals treated him.

¶ 23    When the officers met with Lorenz, he was lying in a hospital bed, connected to medical equipment, and wearing a neck brace. Although Trooper Acuna observed that Lorenz was in "some type of visible pain," he was "conscious," "alert," and able to "effectively communicate."

¶ 24    Trooper Acuna questioned Lorenz while Sergeant Brusuelas observed and searched Lorenz's belongings for evidence. Sergeant Brusuelas did not ask Lorenz any questions and was not in the hospital room for some of the time that Trooper Acuna spoke with Lorenz.

¶ 25    Because Lorenz was lying in a room that was only fifteen feet wide by approximately twenty-five feet long, Trooper Acuna stood "right by" Lorenz's right or left shoulder while speaking with him. When Sergeant Brusuelas was in the room, he stood near the door, which remained open while Trooper Acuna spoke to Lorenz, although a curtain over the door remained closed for Lorenz's privacy.

¶ 26    Trooper Acuna was in Lorenz's hospital room for about two hours. He did not continuously question Lorenz during that time; the medical staff moved Lorenz for treatment and then returned him to the room. Neither Trooper Acuna nor Sergeant Brusuelas followed Lorenz when the medical staff moved him.

¶ 27    Trooper Acuna testified that, while questioning Lorenz, he did not (1) threaten Lorenz; (2) restrain Lorenz; (3) make a gesture toward his handgun; or (4) confront Lorenz with evidence that contradicted his statements. Trooper Acuna said he spoke to Lorenz in a "soft and calm tone." At no time did Lorenz say he (1) did not want to talk to Trooper Acuna; (2) did not want Trooper Acuna in the hospital room; or (3) wanted to consult with an attorney.

¶ 28    Defense counsel pointed to the following facts in support of his argument that Lorenz had been in custody for *Miranda* purposes when Trooper Acuna questioned him:

- the hospital room was small;

- Trooper Acuna and Sergeant Brusuelas stood between Lorenz and the hospital room door;

- the curtain that covered the door remained closed;

- Lorenz was attached to medical equipment;

- he was immobile;

- he was "visibly upset";

- Trooper Acuna never told Lorenz he was free to leave;

- Trooper Acuna challenged Lorenz's memory; and

- Trooper Acuna asked him leading questions concerning whether he had been driving at the time of the crash.

¶ 29    In addition, defense counsel argued that all of Lorenz's statements at the hospital had been involuntary because of his physical condition and that Lorenz's later waiver of his *Miranda* rights was invalid.

¶ 30    The trial court denied Lorenz's motion.

### 2. Lorenz's Preserved Contentions

#### a. Standard of Review

¶ 31    Lorenz preserved his contentions that he was in custody before Trooper Acuna gave him his *Miranda* advisement and that the officers coerced him into incriminating himself.  Contrary to the People's argument, Lorenz also preserved his contention regarding the voluntariness of his *Miranda* waiver because he raised a general challenge to its validity in a written pretrial motion, he developed that challenge at a suppression hearing, and the trial court ruled on whether his waiver was involuntary.  *See People v. Dinapoli*, 2015 COA 9, ¶ 20, 369 P.3d 680, 683 ("A pretrial motion may preserve an evidentiary objection for appellate review if the moving party fairly presents the issue to the court and the court issues a definitive ruling.").  Further, contrary to the People's argument, Lorenz preserved his argument that the officers allegedly used an impermissible two-step investigation method.

¶ 32    Although Lorenz did not refer the trial court to *Verigan v. People*, 2018 CO 53, 420 P.3d 247, the case establishing Colorado's legal standard for determining whether an officer used this type of investigation method, he nonetheless argued that the officers'

10

violation of his constitutional rights in eliciting his pre-*Miranda* statements tainted his post-*Miranda* statements, in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004). *See People v. Melendez*, 102 P.3d 315, 322 (Colo. 2004) ("We do not require that parties use 'talismanic language' to preserve particular arguments for appeal . . . ." (quoting *People v. Syrie*, 101 P.3d 219, 223 n.7 (Colo. 2004))).

¶ 33    "The trial court's ruling on [a] motion to suppress presents a mixed question of law and fact." *People v. Webb*, 2014 CO 36, ¶ 9, 325 P.3d 566, 569. Under this standard, we defer to "the trial court's findings of fact if they are supported by competent evidence in the record," but we review de novo "the trial court's legal conclusions." *Id.*

¶ 34    In addition, whether Lorenz's *Miranda* waiver and statements at the hospital were voluntary is "a legal question and is reviewed de novo." *Effland*, 240 P.3d at 878.

b.    Lorenz Was Not in Custody When
He Made His Pre-*Miranda* Statements

¶ 35    "A person is in custody for *Miranda* purposes if [he] has been formally arrested or if, under the totality of the circumstances, a

11

reasonable person in the suspect's position would have felt that [his] freedom of action had been curtailed to a degree associated with formal arrest." *People v. Garcia*, 2017 CO 106, ¶ 20, 409 P.3d 312, 317. A "custody assessment 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" *Mumford*, ¶ 15, 270 P.3d at 957 (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).

¶ 36     In contrast to a custodial detention, an investigative detention occurs "when a reasonable person would not have felt 'free to leave' or otherwise terminate an encounter with law enforcement." *People v. Barraza*, 2013 CO 20, ¶ 17, 298 P.3d 922, 926 (quoting *People v. Stephenson*, 159 P.3d 617, 620 (Colo. 2007)). "A 'custodial' detention entails a greater restriction on freedom than that associated with investigative detentions under the Fourth Amendment." *People v. Pleshakov*, 2013 CO 18, ¶ 20, 298 P.3d 228, 233. "[A]lthough an investigatory detention constitutes a 'seizure' for purposes of the Fourth Amendment, such detention does not necessarily mean that the suspect is 'in custody' for purposes of *Miranda*." *People v. Davis*, 2019 CO 84, ¶ 20, 449 P.3d

732, 738 (quoting *People v. Breidenbach*, 875 P.2d 879, 885 (Colo. 1994)).

¶ 37     In *People v. Sampson*, a uniformed officer questioned and confronted the defendant while he was hooked up to medical equipment in a small hospital room in which the officer physically blocked the door. 2017 CO 100, ¶¶ 27-30, 404 P.3d 273, 278-79. The supreme court held that the defendant was not in custody for *Miranda* purposes because the officer's exchange with the defendant remained noncoercive — the officer asked open-ended questions that elicited answers in narrative form and did not make accusations; the defendant was not upset; the officer never restrained the defendant or referenced his weapon; the defendant never sought to terminate the conversation; and medical staff freely entered and left the room during the questioning. *Id.*

¶ 38     Similarly, in *People v. Theander*, the supreme court held that the hospitalized defendant was not in custody for *Miranda* purposes even though the officers questioned her while she was confined to a hospital bed, they stood close to the bed, and they expressed their disbelief at parts of her story. 2013 CO 15, ¶¶ 27-37, 295 P.3d 960, 968-69. The supreme court focused on the key facts that the

officers repeatedly told the defendant she was not in custody, wore plain clothes, did not openly carry weapons, maintained a polite and conversational tone, and asked open-ended questions. *Id.* Further, the defendant's limited mobility was attributable to her medical condition, and the door to her hospital room remained open while the defendant spoke with the officers. *Id.* The supreme court concluded that the trial court erred by "placing considerable weight on the fact that the officers subjectively believed that [the defendant] was a suspect" because the defendant was "unaware" of the officers' "subjective thoughts and beliefs." *Id.* at ¶ 23, 295 P.3d at 967.

¶ 39    In contrast to *Sampson* and *Theander*, the supreme court held that the hospitalized defendant in *Effland* was in custody for *Miranda* purposes because the overall circumstances were coercive — the defendant was handcuffed at the crime scene, was accompanied to the hospital by an officer, saw a uniformed officer stationed outside his room at all times, and was emotionally distraught throughout the questioning. 240 P.3d at 871-76. Moreover, the two interrogating officers excluded the defendant's daughter from the room, closed the door to the room, sat extremely

14

close to the defendant, positioned themselves between the defendant and the only exit, structured their questioning so the defendant would agree with their version of events, and repeatedly ignored the defendant's clear invocations of his right to remain silent and to speak with an attorney. *Id.*

¶ 40 Finally, like the defendant in *Effland*, the defendant in *People v. Minjarez* was in custody for *Miranda* purposes because the officers escorted the defendant to a private hospital conference room, a nurse closed the door to the room, the officers seated themselves between the defendant and the only exit, the defendant was visibly emotional and cried throughout the questioning, the officers confronted the defendant with supposed evidence that contradicted the defendant's story, and the lead officer framed his statements so the defendant merely agreed with the officer's version of events rather than give a narrative account. 81 P.3d 348, 350-57 (Colo. 2003).

¶ 41 Consistent with the analyses in these cases, the following factors indicate that Lorenz was not in custody before his *Miranda* advisement:

- He was not handcuffed at the crash site.

- An officer did not accompany him during his transportation to the hospital.

- At no point did officers sit outside Lorenz's hospital room.

- The only restraints on Lorenz were medical equipment.

- Officers did not escort Lorenz to a private room for questioning; instead, they questioned him in the hospital room with the door open.

- Trooper Acuna spoke in a conversational tone and asked open-ended questions concerning Lorenz's identity and the cause of the crash.

- The officers did not make any gestures toward their weapons.

- Trooper Acuna did not confront Lorenz with evidence challenging Lorenz's denial that he had been driving — he did not say he disbelieved Lorenz and did not point out that Lorenz's left shoulder bruise was consistent with pressure from the driver's side seatbelt — and he did not frame his questions to force Lorenz to agree with his statements.

16

- Trooper Acuna asked Lorenz direct questions, and the tone of the conversation remained calm.

- Lorenz did not try to stop Trooper Acuna from asking questions.

- Medical staff interrupted the questioning on multiple occasions.

- Neither officer followed Lorenz out of the room when medical staff moved him for treatment.

¶ 42 The factors supporting a determination that Lorenz was in custody before Trooper Acuna provided the *Miranda* advisement are the following:

- Two uniformed officers were in Lorenz's room with their weapons holstered.

- At times, Sergeant Brusuelas blocked the door while Trooper Acuna stood close to Lorenz.

- The curtain covering the door remained closed.

- Trooper Acuna asked Lorenz direct questions regarding whether he was the driver and how much he had had to drink.

17

- Neither officer told Lorenz that he was not in custody or that he could stop the questioning.

- The questioning lasted for about two hours.

¶ 43 But Sergeant Brusuelas was not present throughout Trooper Acuna's questioning, and Sergeant Brusuelas did not continuously block the door. In addition, like the officer in *Theander*, Trooper Acuna stood close to Lorenz only so he could easily communicate with him. *See Theander*, ¶ 30, 295 P.3d at 968.

¶ 44 After considering these facts and the case law discussed above, we conclude that any reasonable person in Lorenz's position would not have believed he was being arrested or detained to a degree associated with a formal arrest when Trooper Acuna began his questioning. Under the totality of the circumstances, any reasonable person would have recognized that Trooper Acuna did not have sufficient evidence at the time to believe that a crime had been committed, much less that Lorenz was responsible for that crime. *See Garcia*, ¶ 20, 409 P.3d at 317. The evidence shows that Trooper Acuna was conducting a preliminary investigation into the crash until Lorenz admitted he had been driving. As soon as Lorenz made this admission, Trooper Acuna's preliminary investigation

concluded, Lorenz became a suspect, and Trooper Acuna read Lorenz his *Miranda* rights.

¶ 45    Therefore, we hold that the trial court did not err by determining that Lorenz's questioning was not custodial and, therefore, his pre-*Miranda* statements were admissible.

### c.    The Officers Did Not Coerce Lorenz into Incriminating Himself

¶ 46    For the same reasons, there is no evidence that the officers coerced Lorenz into incriminating himself. "A confession or inculpatory statement is involuntary if coercive governmental conduct played a significant role in inducing the statement." *People v. Gennings*, 808 P.2d 839, 843 (Colo. 1991). "Coercion includes physical abuse, threats, and exploitation of a person's weakness by psychological intimidation." *People v. Zadra*, 2013 COA 140, ¶ 31, 396 P.3d 34, 44, *aff'd*, 2017 CO 18, 389 P.3d 885; *see People v. Humphrey*, 132 P.3d 352, 361 (Colo. 2006) ("Ultimately, the test of voluntariness is whether the individual's will has been overborne." (quoting *People v. Miranda-Olivas*, 41 P.3d 658, 661 (Colo. 2001))).

¶ 47    "The voluntariness doctrine requires a two-step inquiry." *People v. Ramadon*, 2013 CO 68, ¶ 20, 314 P.3d 836, 842. "First,

the police conduct must have been coercive," and "[s]econd, the coercive police conduct must have played a significant role in inducing the statements." *Id.*

¶ 48     As noted above, the evidence shows that the tone of Lorenz's conversation with Trooper Acuna remained calm, neither officer physically restrained Lorenz or made threats or promises to him, and Trooper Acuna did not exert his authority over Lorenz.  In addition, the medical personnel treating Lorenz, not the officers, prevented him from leaving the hospital room.  Thus, we need not reach the second step of the voluntariness inquiry, *see id.*, and we hold that the officers did not coerce Lorenz into admitting he was driving at the time of the crash.

### d.     Lorenz's *Miranda* Waiver Was Voluntary

¶ 49     We next turn to the admissibility of the incriminatory statements that Lorenz made after Trooper Acuna read Lorenz his *Miranda* rights.  This analysis focuses on whether he voluntarily waived those rights.

¶ 50     A defendant "may waive effectuation of [the] rights" contained in a *Miranda* warning.  *Miranda,* 384 U.S. at 444.  But as relevant

here, such a waiver must be made "voluntarily." *Id.*; *accord People v. Barrios*, 2019 CO 10, ¶ 12, 433 P.3d 1218, 1222.

¶ 51    A *Miranda* waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *People v. Hopkins*, 774 P.2d 849, 851 (Colo. 1989) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). In contrast, a *Miranda* waiver is involuntary "only if coercive governmental conduct — whether physical or psychological — played a significant role in inducing the defendant" to waive his rights. *People v. May*, 859 P.2d 879, 883 (Colo. 1993).

¶ 52    In determining whether a waiver was voluntary, courts evaluate the nature and timing of the officers' conduct, including, as relevant here, whether they made misrepresentations involving facts of which the defendant lacked firsthand knowledge, attempted to "create a false camaraderie with the suspect" or told the suspect that someone else had already confessed, or otherwise made "affirmative misrepresentations that directly undercut *Miranda*'s intended protections." *People v. Smiley*, 2023 CO 36, ¶¶ 25-27, 530 P.3d 639, 646. In addition, courts consider self-induced intoxication when the defendant argues that his waiver was not

"knowing and intelligent." *People v. Platt*, 81 P.3d 1060, 1066 (Colo. 2004).

¶ 53    When giving Lorenz his *Miranda* advisement, Trooper Acuna maintained a conversational tone and did not physically threaten him. *See May*, 859 P.2d at 883. Trooper Acuna did not engage in any trickery. *See Miranda*, 384 U.S. at 476. Specifically, he did not misrepresent the facts of the crash that Lorenz could not independently assess, try to create a false camaraderie with Lorenz, or make "affirmative misrepresentations that directly undercut *Miranda*'s intended protections," *Smiley*, ¶¶ 25-27, 530 P.3d at 646, such as assuring Lorenz of "more favorable treatment" if Lorenz admitted he was the driver, *id.* at ¶ 28, 530 P.3d at 646-47 (quoting Paul Marcus, *It's Not Just About Miranda: Determining the Voluntariness of Confessions in Criminal Prosecutions*, 40 Val. U. L. Rev. 601, 616 (2006)).

¶ 54    Further, because Lorenz was conscious, was able to think clearly, and provided responsive answers, the physical pain he was experiencing did not render his *Miranda* waiver involuntary. *Cf. Mincey v. Arizona*, 437 U.S. 385, 397-401 (1978) (holding that a suspect's *Miranda* waiver was involuntary because he was gravely

injured, was drifting in and out of consciousness, was unable to think clearly, and repeatedly asked the officers to stop the questioning); *Effland*, 240 P.3d at 878-79 (concluding that a suspect's *Miranda* waiver was involuntary because officers took advantage of his "weakened physical and mental state" and ignored his repeated invocations of his right to remain silent). And given Lorenz's ability to communicate with the officers coherently, his self-induced intoxication does not weigh in favor of a determination that his *Miranda* waiver was involuntary. *See Platt*, 81 P.3d at 1066.

¶ 55    Thus, we hold that the court did not err by concluding that Lorenz voluntarily waived his *Miranda* rights and, therefore, his post-*Miranda* statements were admissible.

e.    Lorenz's Post-*Miranda* Statements Were Not Obtained Through a Deliberate Two-Step Interrogation Method

¶ 56    "A 'two-step interrogation' takes place when officers elicit incriminating statements *from an in-custody suspect* without giving him his *Miranda* rights and then interview him again later and obtain a confession after giving him his *Miranda* rights and securing a waiver of those rights." *Phillips v. People*, 2019 CO 72, ¶ 41, 443

P.3d 1016, 1027 (emphasis added) (quoting *Verigan*, ¶ 20, 420 P.3d at 251).

¶ 57    Lorenz could not have been subjected to a prohibited two-step interrogation because, as explained above, he was not in custody before Trooper Acuna read him his *Miranda* rights. *See People v. Lulei*, 2026 CO 17, ¶¶ 35-36, ___ P.3d ___, ___. Accordingly, the court did not err by admitting Lorenz's post-*Miranda* statements.

### 3.    Lorenz's Unpreserved Contention

#### a.    Standard of Review

¶ 58    Because Lorenz did not argue to the trial court that he invoked his right to remain silent while at the hospital, he did not preserve such argument for appellate review. *See People v. Ujaama*, 2012 COA 36, ¶ 37, 302 P.3d 296, 304 (When "no objection or request was made in the trial court," an issue is unpreserved for review.).

¶ 59    We review all errors "that were not preserved by objection for plain error." *Hagos v. People*, 2012 CO 63, ¶ 14, 288 P.3d 116, 120. "Plain error is obvious and substantial." *Id.* "[T]o be deemed plain, an error must contravene a clear statutory command, a well-settled legal principle, or established Colorado case law." *People v. Crabtree*, 2024 CO 40M, ¶ 42, 550 P.3d 656, 667. But we do not

need to conduct a plain error analysis unless we determine that the court erred. *See id.* at ¶ 41, 550 P.3d at 667.

### b. Lorenz Did Not Clearly Invoke His Right to Remain Silent

¶ 60 If a suspect "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74.

¶ 61 In invoking the right to remain silent, "we do not require the suspect to use special or ritualistic phrases." *People v. Arroya*, 988 P.2d 1124, 1132 (Colo. 1999). Instead, "a suspect must clearly articulate the desire to remain silent so that a reasonable police officer in the circumstances would understand the suspect's words and conduct to mean that the suspect is asserting h[is] *Miranda* right to cut off questioning." *Id.* at 1129-30. A suspect's invocation of his right to remain silent is only ambiguous if his words "carry 'opposing inferences.'" *People v. Cerda*, 2024 CO 49, ¶ 27, 559 P.3d 206, 212 (quoting *Arroya*, 988 P.2d at 1136 (Kourlis, J., concurring in part and dissenting in part)).

¶ 62 In determining whether a suspect's statement was a clear assertion of the right to remain silent, we "examine the totality of

25

the circumstances to assess how a reasonable officer in the circumstances would perceive" the statement. *Arroya*, 988 P.2d at 1132; *accord People v. Richardson*, 2014 COA 50, ¶ 28, 350 P.3d 905, 912.

¶ 63 A few minutes into Trooper Acuna's interview with Lorenz, Lorenz told Trooper Acuna that he would say who was driving the truck when it crashed, except that he did not want to incriminate himself. Lorenz argues that the trial court erred by finding that he did not invoke his right to remain silent when he said he did not want to incriminate himself.

¶ 64 Under the case law, however, Lorenz's recognition that a response would be incriminating was not a request that the officers stop questioning him. In *Richardson*, a division of this court held that statements such as "I'm not gonna spill my guts about anything" and "I don't think I want to admit to anything" were not an invocation of the defendant's right to remain silent because they merely reflected a reluctance to confess rather than an unequivocal desire to stop talking to police. *Richardson*, ¶¶ 30-34, 350 P.3d at 912-13. Similarly, in *People v. Sexton*, the division concluded that the defendant's assertion that he was "not going to answer that

question" only communicated a refusal to answer a particular question and was not an invocation of the right to end all questioning. 2012 COA 26, ¶¶ 29-33, 296 P.3d 157, 163. Lorenz does not point to any Colorado case holding that a defendant's statement that he did not want to incriminate himself was the type of unequivocal assertion that a reasonable law enforcement officer would recognize as a clear invocation of the suspect's right to remain silent. *Cf. United States v. Long*, 721 F.3d 920, 922-25 (8th Cir. 2013) (holding that the district court did not plainly err by admitting the defendant's pre-*Miranda* statement, "I do not want to incriminate myself," even if it could be viewed as the defendant's attempt to invoke his Fifth Amendment rights).

¶ 65      In sum, the trial court did not err by refusing to bar the prosecution from introducing into evidence the statements Lorenz made to Trooper Acuna after saying he did not want to incriminate himself.

### B.    The Trial Court Did Not Err by Allowing the Prosecutor to Reference Lorenz's Statement That He Did Not Want to Incriminate Himself

#### 1.    Standard of Review

¶ 66    "We review de novo alleged violations of a defendant's constitutional rights," including alleged violations occurring during a prosecutor's closing argument. *People v. Gallegos*, 2023 COA 47, ¶ 88, 535 P.3d 108, 126, *aff'd*, 2025 CO 41M, 572 P.3d 136.

## 2.    Additional Facts

¶ 67    The prosecutor argued during her rebuttal closing argument that the other evidence of Lorenz's guilt rendered insignificant defense counsel's argument that Lorenz's shoulder bruise did not establish that he had been driving at the time of the crash:

> [The inconsistency around the cause of Lorenz's shoulder bruise] doesn't change what happened. That doesn't change that [Lorenz] was in the driver's seat and the victim was in the passenger's seat. That doesn't change the injuries on the left versus right. That doesn't change the seat position, that the driver's seat was closer and the passenger's seat was further. That doesn't change the fact that [Lorenz] was shorter and victim was taller. That doesn't change the fact that [Lorenz] time and time again admitted that he was the one driving. *He even says I don't want to incriminate myself. You know who says that? A man who knows he did wrong.*

(Emphasis added.) Defense counsel objected that the prosecutor's statements were "not the constitutional meaning of incrimination and right to remain silent."

28

¶ 68    In response to the objection, the trial court instructed the jury that the prosecutor's statements were "not legal definitions" but rather "argument by the attorneys," and it allowed the prosecutor to continue with her argument.

¶ 69    The prosecutor concluded her argument by reminding the jury that Lorenz admitted to being the driver at the time of the crash.

### 3.    The Prosecutor Did Not Commit Misconduct

¶ 70    "In a claim of prosecutorial misconduct, the reviewing court engages in a two-step analysis." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010). "First, it must determine whether the prosecutor's questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard . . . ." *Id.* "Each step is analytically independent of the other." *Id.*

¶ 71    "Claims of improper argument must be evaluated in the context of the argument as a whole and in light of the evidence before the jury." *People v. Gladney*, 250 P.3d 762, 769 (Colo. App. 2010) (quoting *People v. Geisendorfer*, 991 P.2d 308, 312 (Colo. App. 1999)).

¶ 72    "[P]rosecutors have wide latitude in the language and style they choose to employ, as well as in replying to an argument by opposing counsel." *People v. McMinn*, 2013 COA 94, ¶ 60, 412 P.3d 551, 563.  They may "comment on the evidence admitted at trial and the reasonable inferences that can be drawn therefrom" and "employ rhetorical devices and engage in oratorical embellishment and metaphorical nuance." *Id.* at ¶ 61, 412 P.3d at 564; *see Gladney*, 250 P.3d at 769 (affording the prosecutor broad latitude in rebutting the defense's argument through reasonable inferences and permissible rhetoric).  "In addition, because arguments delivered in the heat of trial are not always perfectly scripted, reviewing courts accord prosecutors the benefit of the doubt when their remarks are ambiguous or simply inartful." *McMinn*, ¶ 60, 412 P.3d at 563.

¶ 73    However, a prosecutor must "avoid making or inducing comments at trial that will prejudice the defendant for exercising his Fifth Amendment rights," including his right to remain silent. *People v. Reynolds*, 575 P.2d 1286, 1292 (Colo. 1978); *see People v. Cuellar*, 2023 COA 20, ¶¶ 37-38, 530 P.3d 1236, 1245 (holding that the prosecutor engaged in misconduct by telling the jury that a

detective had been unable to speak with the defendant because the defendant had requested an attorney); *People v. Burnell*, 2019 COA 142, ¶¶ 41, 46-47, 459 P.3d 736, 743-44 (deeming it misconduct for a prosecutor to tell the jury that the defendant answered multiple questions before "invok[ing] his Fifth Amendment rights").

¶ 74     The prosecutor's argument did not constitute misconduct because Lorenz's statement that he did not want to incriminate himself was not a clear invocation of his right to remain silent, as explained above.  Thus, the prosecutor did not improperly comment on Lorenz's exercise of his Fifth Amendment rights and, accordingly, the court did not err by allowing the prosecutor to argue that Lorenz must be guilty because he said he did not want to incriminate himself.

### C.     The Trial Court Did Not Err by Barring the Introduction of the Victim's Prior Convictions

#### 1.     Standard of Review

¶ 75     "We will reverse the trial court's evidentiary rulings only for an abuse of discretion."  *People v. Elmarr*, 2015 CO 53, ¶ 20, 351 P.3d 431, 437-38.  "A trial court abuses its discretion when it misconstrues or misapplies the law, or when its decision is

31

manifestly arbitrary, unreasonable, or unfair." *People v. Knapp*, 2020 COA 107, ¶ 31, 487 P.3d 1243, 1252.

¶ 76 We do not review whether the court's evidentiary ruling violated Lorenz's constitutional rights because the trial court's decision to exclude evidence of the victim's convictions for DUI or DWAI did not implicate any such rights. A defendant's right to present a defense is "generally subject to, and constrained by," the rules of evidence. *Elmarr*, ¶ 27, 351 P.3d at 438.

### 2. Additional Facts

¶ 77 The evidence introduced at trial established that officers could not extract DNA evidence or obtain fingerprints from the area around the driver's seat.

¶ 78 Defense counsel asked Trooper Yoder about the scope of the officers' investigation into the crash, including the driving records of the individuals who had been in the truck at the time:

> [DEFENSE COUNSEL]: Did you review the driving records of the parties involved in this case?
>
> [TROOPER YODER]: I did.
>
> [DEFENSE COUNSEL]: Okay. So you're aware that [the victim] had three —

[PROSECUTOR]: Objection, your Honor. Relevance.

THE COURT: I don't know. Why don't you approach?

¶ 79    During the bench conference, defense counsel argued that the victim's three convictions for felony DUI and DWAI were relevant to show that the victim was the only occupant in the truck with such a driving history. In response, the prosecutor asserted that defense counsel's relevance argument relied on an improper propensity inference.

¶ 80    The trial court allowed further argument on this point the next day. Defense counsel argued that, under *Elmarr*, evidence of the victim's prior convictions was admissible because they all related to driving while impaired or under the influence and the crash resulted from the driver's intoxication. Defense counsel further argued that the victim had an opportunity to cause the truck crash because he and Lorenz were the only occupants of the truck at the time.

¶ 81    For three reasons, the trial court excluded evidence of the victim's prior convictions. First, the court found "big distinctions" between the facts in *Elmarr* and those in Lorenz's case — in *Elmarr*,

the defendant sought to introduce the alternate suspect's confession to the charged crime (murder) and admission that he had previously committed another murder. Second, it concluded that, if admitted, the victim's prior convictions would suggest that the victim "like[d] to drive drunk in disregard for the law," which was an improper propensity argument. Third, the court determined that admitting evidence of the victim's prior convictions "would open a door for the [prosecution] to potentially call family members [who would] say [the victim] learned his lesson, he ha[d] not driven drunk since [his last conviction in 2016], and [the trial would] get into a side show which [was] not an issue in this case."

### 3. The Victim's Prior Convictions Were Not Proper Alternate Suspect Evidence

¶ 82 A defendant's constitutional right to present a defense includes "the right to present evidence that someone other than the defendant may have committed the crime, because 'a criminal defendant is entitled to all reasonable opportunities to present evidence that might tend to create doubt as to [his] guilt.'" *People v. Shanks*, 2019 COA 160, ¶ 57, 467 P.3d 1228, 1242 (quoting *People v. Folsom*, 2017 COA 146M, ¶ 30, 431 P.3d 652, 658). But this

right to present a defense operates within, and is limited by, the rules of evidence. *Elmarr,* ¶¶ 22-27, 351 P.3d at 438; *accord People v. Salazar,* 2012 CO 20, ¶ 17, 272 P.3d 1067, 1071-72.

¶ 83 CRE 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." A defendant implicates CRE 404(b) when arguing that an alternate suspect's prior acts suggest that the alternate suspect committed the crime. *Salazar,* ¶ 14, 272 P.3d at 1071.

> CRE 404(b) is not, on its face, limited to evidence offered by the prosecution regarding similar acts committed by the defendant. However, the concern for prejudice to the defendant that gave rise to the common law rule that underpins CRE 404(b) does not exist when the defendant offers other acts evidence of an alternate suspect.

*Elmarr,* ¶ 36, 351 P.3d at 440; *accord Salazar,* ¶ 18, 272 P.3d at 1072.

¶ 84 The supreme court explained in *Elmarr* that, even though a "more lenient standard of admissibility" applies when a defendant offers evidence of an alternate suspect's other acts, a defendant may

35

not introduce such evidence purely to infer that the alternate suspect acted in conformity with his bad character. *Elmarr*, ¶ 39, 351 P.3d at 441 (quoting *People v. Flowers*, 644 P.2d 916, 919 (Colo. 1982), *abrogated on other grounds by*, *Elmarr*, 2015 CO 53, 351 P.3d 431). Moreover, "other acts of an alternate suspect generally are offered to show *identity*," and "an inference that the alternate suspect committed the other acts and the charged crime is permissible only where the prior acts and the charged crime share sufficient similar characteristics or details." *Id.*

¶ 85 That similarity must be so distinctive or unusual that it represents "the 'signature' of a single individual." *Id.* (quoting *Flowers*, 644 P.2d at 920); *see Flowers*, 644 P.2d at 920 (upholding the exclusion of other act evidence because the "details of the other crimes were not distinctive or unusual enough to represent the 'signature' of a single individual, but were features common to most sexual assaults and merely would demonstrate that there was more than one person committing sexual assaults in the area"); *Salazar*, ¶ 26, 272 P.3d at 1074 ("The acts and circumstances of [the alternate suspect's] prior alleged acts and the acts and circumstances of the assaults on [the victim] are not distinctive or

unusual enough to support a finding that the same person probably was involved in both cases.").

¶ 86 "The touchstone of relevance in th[e] context [of alternate suspect evidence] is whether the alternate suspect evidence establishes a [nonspeculative] connection or nexus between the alternate suspect and the crime charged." *Elmarr*, ¶ 32, 351 P.3d at 439. "That is, the alternate suspect evidence must create more than just an unsupported inference or possible ground for suspicion." *Id.* "Anything less may lead to speculative blaming that heightens the risk of jury confusion and invites the jury to render its findings based on emotion or prejudice." *Id.* For these reasons, "[i]n the alternate suspect context, . . . the overarching relevance inquiry remains whether the evidence, taken collectively, establishes a [nonspeculative] connection between the alternate suspect and the charged crime." *Id.* at ¶ 40, 351 P.3d at 441.

¶ 87 Therefore, "evidence merely showing that someone else had a motive or opportunity to commit the charged crime — without other additional evidence circumstantially or inferentially linking the alternate suspect to the charged crime — presents too tenuous and speculative a connection to be relevant." *Id.* at ¶ 34, 351 P.3d at

37

440. Because "mere motive or opportunity is insufficient[,] a defendant must proffer something 'more' to establish [a] [nonspeculative] connection." *Id.*

¶ 88    Lorenz did not "proffer something 'more' to establish [a] [nonspeculative] connection" between the victim and the cause of the crash. *Id.* This is particularly true because the record is devoid of any information regarding the circumstances surrounding the victim's convictions, *see People v. Donald*, 2020 CO 24, ¶ 30, 461 P.3d 4, 9-10, and no physical evidence, such as DNA evidence, placed the victim in the driver's seat at the time of the crash. There may have been a closer connection between the prior act evidence and the cause of the crash if the evidence showed that the victim had been driving at the time and the only disputed issue concerned whether he had been intoxicated. But the victim's prior DUI and DWAI convictions did not make it more or less likely that he had been behind the wheel at the time the truck ran off the road.

¶ 89    Thus, Lorenz's attempt to implicate the victim based on his prior acts rested solely on the improper speculative inference that, because the victim had driven under the influence before, he must have done so at the time of the crash. CRE 404(b) bars a party

from inferring from this type of propensity evidence that an alternative suspect committed the crime. *See Elmarr*, ¶ 36, 351 P.3d at 440; *Salazar*, ¶ 18, 272 P.3d at 1072. And the lack of information regarding the facts underlying the victim's convictions meant Lorenz could not show that those facts were distinctive or unusual enough to support a finding that the victim was driving under the influence because he had done so before. *See Salazar*, ¶ 26, 272 P.3d at 1074.

¶ 90     For these reasons, the trial court did not err by excluding evidence of the victim's prior convictions.

### D.   Lorenz's DUI and DUI Per Se Convictions Must Merge With His Vehicular Homicide Conviction

¶ 91     Lorenz argues, the People concede, and we agree, that Lorenz's DUI and DUI per se convictions merge into his conviction for vehicular homicide.

¶ 92     The Double Jeopardy Clauses of the United States and Colorado Constitutions prohibit placing a defendant in jeopardy more than once for the same offense. *See* U.S. Const. amends. V, XIV; Colo. Const. art. II, § 18. "[A] defendant may not receive multiple punishments for the same offense unless such

punishments are legislatively authorized." *People v. Tun*, 2021 COA 34, ¶ 43, 486 P.3d 490, 499.

¶ 93 "In Colorado, the General Assembly has determined that a defendant may not be convicted of two different offenses if one offense is a lesser included offense of the other." *Id.* Under the strict elements test, which we apply to determine "whether one offense is a lesser included offense of another," *Reyna-Abarca v. People*, 2017 CO 15, ¶ 3, 390 P.3d 816, 818, "[o]ne offense is a lesser included offense of the other if 'the elements of the lesser offense are a subset of the elements of the greater offense, such that the lesser offense contains only elements that are also included in the elements of the greater offense.'" *Tun*, ¶ 43, 486 P.3d at 499 (quoting *Reyna-Abarca*, ¶ 3, 390 P.3d at 818).

¶ 94 In *Reyna-Abarca*, the supreme court, applying the strict elements test, concluded that DUI is a lesser included offense of vehicular homicide because every element of DUI is necessarily contained within the broader elements of vehicular homicide. *Reyna-Abarca*, ¶¶ 71-78, 390 P.3d at 827. In other words, facts proving that a defendant drove a vehicle while under the influence are "a subset" of the broader array of facts that can satisfy the

elements of vehicular homicide. *Id.* at ¶¶ 62, 71-78, 390 P.3d at 826-27.

¶ 95 Under the *Reyna-Abarca* framework, driving a vehicle with a BAC of 0.08 or more is "a subset" of facts that can satisfy the elements of vehicular homicide. *Id.* at ¶¶ 3, 62, 71-78, 390 P.3d at 818, 826-27. And in Lorenz's case, the prosecution proved the vehicular homicide count using the same facts that also proved the DUI per se count.

¶ 96 Accordingly, because Lorenz's convictions arose from a single incident involving a single victim, under *Reyna-Abarca*, Lorenz's DUI and DUI per se convictions must merge with his vehicular homicide conviction.

### III. Disposition

¶ 97 The judgment is affirmed in part and reversed in part, and the case is remanded with directions to merge the lesser included offenses into the vehicular homicide conviction.

JUDGE WELLING and JUDGE TOW concur.